# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

_____

**In Re:**

PAUL S. PENLAND and
LESLIE D. PENLAND,

**Debtors.**

**Bankruptcy Case
No. 05-00172**

_____

## MEMORANDUM OF DECISION
_____

**Appearances:**

      Stephen W. French, Boise, Idaho, Attorney for Debtors.

      Jed W. Manwaring, EVANS, KEANE, Boise, Idaho, Attorney for
Trustee.

      Bernie Rakozy, Boise, Idaho, Chapter 13 Trustee.

### Introduction

      In this case, the Court concludes that the Chapter 13 debtors, a

couple who earns over $120,000 per year, and spends over $60,000 per year on

living expenses, have not proposed their Chapter 13 plan in good faith.  Therefore,

the plan can not be confirmed and this case will be dismissed.

MEMORANDUM OF DECISION - 1

**Procedural Background**

Debtors Paul and Leslie Penland originally filed for relief not under Chapter 13, but instead under Chapter 7 of the Bankruptcy Code on January 20, 2005.  Docket No. 1.  In their schedules, Debtors listed $810,565.83 in assets, claiming all the equity as exempt.  They scheduled $475,469.05 in  liabilities, of which $221,824.05 is unsecured.  Am. Summ. of Schedules, Docket No. 8. Based upon its independent review of the Debtors' schedules and case file, and acting on its own motion, the Court issued an Order to Appear and Show Cause why the bankruptcy case should not be dismissed pursuant to 11 U.S.C. § 707(b) on April 15, 2005.  Docket No. 16.  Shortly thereafter, the court ordered Debtors to submit to a Rule 2004 examination by the U.S. Trustee.  On June 3, 2005, the Friday before the Monday examination was to occur, and after spending nearly four months in the Chapter 7 case, Debtors moved to convert that case to a Chapter 13 case.  Docket No. 26.  The Court ordered the conversion on June 7, 2005.  Docket No. 28

On June 22, 2005, the last day they were allowed to do so under Fed. R. Bankr. P. 3015(b), Debtors filed their first proposed Chapter 13 Plan. Docket No. 34.  In it, Debtors proposed to pay 36 monthly payments of $300 each to their creditors.  Confirmation hearings concerning the plan were conducted on August

MEMORANDUM OF DECISION - 2

30 and September 29, and in both instances, continued.  Docket Nos. 50 and 52.

During this time, the Chapter 13 Trustee, Bernie Rakozy, filed three different

recommendations concerning Debtors' plan, Docket Nos. 42, 46 and 49.  In each,

he opposed confirmation of the plan and requested that Debtors provide him an

extensive list of necessary information concerning their assets, income, and

prebankruptcy transactions.

       Two days before the third continued confirmation hearing, on

October 9, Debtors filed a First Amended Plan and Amended Schedule J.  Docket

Nos. 54, 55.  In their new plan, Debtors proposed three months of payments at

$300, and 52 months of payments at $925.  At the October 11 confirmation

hearing, both Debtors testified, and the Court took the issues under advisement.

Debtors were admonished at the conclusion of the hearing that, given the

procedural history of the case and concerns by the Court regarding confirmation,

the Court would allow Debtors but one more opportunity to amend their plan to

reflect their best approach to dealing with their debts through Chapter 13 relief.

Apparently accepting the Court's invitation, on October 12, Debtors again

amended Schedule J decreasing their monthly expenses by $100, and filed a

Second Amended Plan now proposing three payments of $300 and 57 months of

payments at $1,025.  Docket Nos. 57, 58.

MEMORANDUM OF DECISION - 3

It is Debtors' Second Amended Plan that the Court now considers. After a careful review of the evidence, testimony and record, what follows constitutes the Court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052; 9014.

## Facts

Paul Penland is an accomplished attorney with 25 years of experience.  He is a partner in an established Boise law firm.  According to his testimony, his current "salary" is approximately $85,584 a year.  To the Court, this seems low for a lawyer of Debtor's status and experience.  Moreover, Mr. Penland's sworn schedules indicate he earned over $100,000 in each of the past two years.  Statement of Fin. Affairs, Docket No. 8.

Mr. Penland testified he does not expect to earn more than his law firm salary this year due to the state of his worker's compensation practice, which comprises the bulk of his work.   Mr. Penland explained that currently several of his larger insurance clients are unwilling to allow him a rate increase, and have begun routinely "cutting" his billings.  This has forced Mr. Penland to either absorb a loss on this business or lose the client to another attorney.

Ms. Penland is a banker.  She is secure in her employment and has worked at Keybank for eleven years.  She earns approximately $35,000 a year.

MEMORANDUM OF DECISION - 4

Debtors testified they accumulated most of their debt through credit card purchases made over several years.  They owe about $200,000 of such debt.  However, it is unclear, given the extensive amount of debt involved, and the lack of assets described in their schedules, what sorts of specific goods or services were acquired with this credit.

In the past, credit card payments were made with the bonuses Mr. Penland received at the law firm and by stock sales.  Debtors testified they began having problems making their payments in 2003 when Ms. Penland's mother became ill and she took time off from work to care for her, initially at the parents' home in Las Vegas.  Her mother's health has apparently stabilized, and Ms. Penland is again working full-time.  Her parents, the Derrs, have now moved into Debtors' home in Boise.   The Derrs do not require outside care.

In an attempt to deal with their declining financial situation,  Mr. Penland worked more hours.  As Debtors' financial problems escalated, Mr. Penland experienced health problems related to stress.  He testified he suffers from depression and anxiety, and has had two bouts of optical neuritis that rendered him nearly unable to see.  He is currently under a physician's care, but works full-time.

MEMORANDUM OF DECISION - 5

Shortly before filing for bankruptcy, in September 2004, the Derrs loaned Debtors each $26,000, or a total of $52,000.  The loans required Debtors to make monthly payments over ten years with 7% interest.  The loans are secured by deeds of trust on Debtors' home.  Debtors testified they used the loan proceeds to make house payments and for home improvement projects, including installing a new roof for $11,000, new gutters, remodeling closets, painting, and landscaping.  Ms. Penland testified the loans were extended to Debtors when her parents, who sensed something was wrong, asked if they could help Debtors.

Remarkably, while they accepted over $50,000 from the Derrs, Debtors each testified they are completely uninformed about the Derrs' financial situation and do not know if the loans created a hardship for them.  Instead, Debtors testified that the Derrs are very private people who do not discuss their financial situation.  Ms. Penland knows her parents receive social security benefits, and is aware that her father receives a monthly pension payment.  Debtors know nothing else about the extent of the Derrs' income or assets.  The Derrs pay no rent to Debtors, nor do they otherwise contribute to payment of household expenses.  Mr. Penland testified he is not aware who pays for food, but he knows that Debtors pay other expenses for the household.  When questioned

MEMORANDUM OF DECISION - 6

why the Derrs do not contribute to the household finances, Debtors responded that they do not believe in charging family.

Debtors have a fairly unremarkable collection of assets. Only a few of those assets deserve special comment here.

Debtors' schedules assign a $0 value to Mr. Penland's 33% ownership interest in his law firm. Am. Schedule B, Docket No. 45. No specific evidence, documents or other analysis was offered to support this opinion. The Court is concerned that, unless the firm is insolvent, even as a small business, Mr. Penland's equity should have some positive value. Absent proof, however, the Court can not be sure.

In addition, over the years, Debtors have accumulated nearly $500,000 in their various retirement accounts. *Id.* These funds are claimed exempt, but again, no evidence was submitted to explain whether Debtors have any rights under the plans' terms to access or borrow against those funds.

Debtors' most significant tangible asset is their home, which they purchased in 1980 or 1981. It is located in a mature residential Boise neighborhood, and contains 3,600 square feet of living space, including five bedrooms, a study, and a walk-out basement. A few years ago Debtors remodeled the home. The Court was provided with no expert opinion of value, but Mr.

MEMORANDUM OF DECISION - 7

Penland believes the home is worth about $300,000.  While the Court heard no evidence to contradict this testimony, the Court is skeptical of the modest valuation placed on the house given its size, location, the various improvements made recently to the home, and the escalating local housing market.   Debtors considered moving to a smaller home once all their children moved away, but decided against doing so to ensure they would have room to accommodate their parents if needed.  Debtors testified they owe approximately $200,000 on their first mortgage in addition to the $52,000 plus interest owed to the Derrs.   The Derrs have agreed to defer any payments on their loans while Debtors attempt to complete their Chapter 13 plan.

Debtors' most recent expense schedule reflects they spend approximately $5,300 per month on living expenses.[1]  Their mortgage payments are $2,179.[2]  In addition to this amount, they spend about $400 monthly on

_____

[1] The Court's analysis reflects Debtors' most recent Schedule J.  An original Schedule J was filed with the petition on January 20, 2005.  Amended Schedules were filed on February 16; June 22; October 9; and October 12, 2005.  This Court has commented that in determining good faith the Court can refer to the earlier schedules in considering the totality of the circumstances because, while the previous schedules no longer have a "binding, preclusive effect . . . [i]t is still fully subject to consideration by the court as an evidentiary admission."  *In re Kaskel*, 01.4 I.B.C.R. 139, 141–142 (Bankr. D. Idaho 2001) (quoting *In re Bohrer*, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001)).

[2] The Court accepts this amount as reasonable.  However, no details regarding the home mortgage were provided, such as whether Debtors recently refinanced in order to take advantage of lower interest rates.  This situation is unclear due in part to the reported change in the amount of the house payment.  The first two Schedule J reflect a

MEMORANDUM OF DECISION - 8

utilities, $295 on home maintenance, and $30 on homeowner's insurance.  In other words, even without making payments to the Derrs, it costs Debtors about $3,000 per month to live in their home.

Debtors suggest they spend $475 per month on food, together with another $120 for what the Court understands are workday lunches.

While Debtors have a short commute to work each day, they report they spend $540 per month for transportation and another $80 per month for auto insurance.  They have no car payments.

The Chapter 13 Trustee indicated at the October 11 confirmation hearing he has no further objections to confirmation of Debtors' plan.  While the Trustee did not submit a recommendation regarding Debtors' Second Amended Plan filed after that hearing, and since that plan merely increases the plan payments, the Court presumes the Trustee would also not object to confirmation. And from the information previously submitted by the Trustee and in the record, the Court also presumes that Debtors' proposed plan will pay their unsecured creditors substantially more than they would receive were Debtors' assets liquidated under Chapter 7.

_____

house payment of $2,904, an unexplained reduction to $2,802 in the June 22, 2005 amendment, and the most recent two amendments show a house payment of $2,179.  The final reduction was explained by the Derr's agreement to forego repayment during the plan.

MEMORANDUM OF DECISION - 9

**Disposition of the Issues**

**A.    The Bankruptcy Code Requires that a Debtor's Chapter 13 Plan be Submitted in Good Faith.**

As announced to the parties at the confirmation hearings, the Court is concerned whether Debtors' plan has been submitted in good faith, a requirement for its confirmation.  *See* 11 U.S.C. § 1325(a)(3) (providing that "the court shall confirm a plan if . . . the plan has been proposed in good faith and not by any means forbidden by law.").   In this case, neither the Chapter 13 Trustee nor any creditor opposes confirmation.  But even lacking such an objection, Debtors' proposed plan must be scrutinized because "pursuant to 11 U.S.C. § 1325(a)(3) [the Court] has an independent duty to make a considered assessment of the debtor's good faith."  *Fid. & Cas. Co. of New York v. Warren* (*In re Warren*), 89 B.R. 87, 90 (9th Cir. BAP 1988) (citing *In re Hale*, 65 B.R. 893, 897 (Bankr. S.D. Ga. 1986); *In re Meltzer*, 11 B.R. 624, 626 (Bankr. E.D.N.Y. 1981)).

"Bankruptcy courts must determine a debtor's good faith on a case-by-case basis, taking into account the particular features of each Chapter 13 plan." *In re Yochum*, 96.2 I.B.C.R. 77, 78 (Bankr. D. Idaho 1996) (citing *In re Porter*, 102 B.R. 773, 775 (9th Cir. BAP 1989)).  Additionally, "[t]he bankruptcy court must consider the totality of circumstances, including prepetition conduct, in deciding whether the debtor has 'acted equitably.'"  *In re Tucker*, 989 F.2d 328,

MEMORANDUM OF DECISION - 10

330 (9th Cir. 1993); *see also In re Yochum*, 96.2 I.B.C.R. at 78  (citing *In re Porter*, 102 B.R. 773, 775 (9th Cir. BAP 1989)).  Debtors bear the burden of establishing their plan was filed in good faith.  *Smyrnos v. Padilla* (*In re Padilla*), 213 B.R. 349, 352 (9th Cir. BAP 1997).  Whether a plan is proposed in good faith is a question of fact.  *Id.* (citing *Matter of Metz*, 820 F.2d 1495, 1497 (9th Cir. 1987)).

The Ninth Circuit has listed the various factors a bankruptcy court should consider in making a Chapter 13 good faith determination, which include: "whether the debtor has misrepresented the facts in his plan; whether the plan is proposed in an inequitable manner; whether the debtor is attempting to unfairly manipulate the Bankruptcy Code; [and] whether the debtor acted in an equitable manner in proposing his plan."  *In re Yochum*, 96.2 I.B.C.R. at 78 (citing *In re Goeb*, 675 F.2d 1386, 1390 (9th Cir. 1982)).  The Bankruptcy Appellate Panel has identified yet other factors bankruptcy courts should consider in a nonexhaustive list:

> 1) The amount of the proposed payments and the amounts of the debtor's surplus;
> 2) The debtor's employment history, ability to earn, and likelihood of future increases in income;
> 3) The probable or expected duration of the plan;
> 4) The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured

MEMORANDUM OF DECISION - 11

debt, and whether any inaccuracies are an attempt to
mislead the court;
5) The extent of preferential treatment between classes
of creditors;
6) The extent to which secured claims are modified;
7) The type of debt sought to be discharged, and
whether any such debt is nondischargeable in Chapter
7;
8) The existence of special circumstances such as
inordinate medical expenses;
9) The frequency with which the debtor has sought relief
under the Bankruptcy Reform Act;
10) The motivation and sincerity of the debtor in
seeking Chapter 13 relief; and
11) The burden which the plan's administration would
place upon the trustee.

*Id.* at 352–353 (citing *In re Warren*, 89 B.R. 87, 93 (9th Cir. BAP 1988)).

**B.     A Review of the Applicable Factors Suggests that Debtors Have Not
Submitted Their Chapter 13 Plan in Good Faith.**

### 1.     Debtors have attempted to manipulate the Bankruptcy Code.

The Court understands Debtors' motivation for seeking bankruptcy

relief; they would no doubt benefit greatly from a discharge of their indebtedness

upon completion of their proposed plan.  However, given this record, the Court

concludes this would be an inequitable result for Debtors' creditors.  In this case,

the Court concludes Debtors have attempted to manipulate the Bankruptcy Code

in such a way as to pay as little of their debt as possible while maintaining the

same comfortable lifestyle they enjoyed prior to bankruptcy.  While debtors in

MEMORANDUM OF DECISION - 12

bankruptcy may legitimately strive to preserve their income and assets, their

conduct must conform with the Bankruptcy Code and not result in an inequitable

plan.   As a result, the Court can not in good conscience confirm Debtors' plan.

In January 2005, Debtors attempted to secure a discharge under

Chapter 7 of the Code without any payment to their unsecured creditors.  The

Court's review of Debtors' schedules revealed that such an attempt may amount to

a substantial abuse of the bankruptcy laws as that term has been interpreted by the

case law.  *In re Price*, 353 F.3d 1135, 1140 (9th Cir. 2004) (citing *Zolg v. Kelly*

(*In re Kelly*), 841 F.2d 908, 914 (9th Cir. 1988)) (holding "a debtor's ability to pay

his debts will, standing alone, justify a section 707(b) dismissal.").  The Court

issued its Order to Show Cause expressing concerns about Debtors' Chapter 7

case in April, 2005.   Debtors remained in Chapter 7 two more months before

converting to Chapter 13, doing so on the last business day before they were to

appear for examination by the U.S. Trustee.  Given the procedural history of this

case, it appears that but for the intervention of the Court and the U.S. Trustee,

Debtors would have indeed exempted all their assets and accepted a Chapter 7

discharge of their debts without any payment to their unsecured creditors or a

change in their spending habits.  But as it turns out, Debtors apparently concede

they have the ability to pay well over $1,000 per month to their creditors.  If that is

MEMORANDUM OF DECISION - 13

true, the Court wonders why Debtors filed for Chapter 7 relief at all, or at least,

why it took them over five months to pursue a Chapter 13 case.

In the four months after converting to Chapter 13, Debtors have

proposed three different debt repayment plans.  Debtors' initial plan provided a

miserly $300 per month to service over $200,000 of unsecured debt.  Each

successive plan has increased that amount.  Again, it appears that it was largely

because of the efforts of the Chapter 13 Trustee to discover the information

necessary to evaluate those plans, and his several negative recommendations, that

Debtors filed their amended plans.  And despite this track record, Debtors' latest

plan continues to raise questions about their motivation in their treatment of

creditors' claims.

In short, Debtors' course of conduct in prosecuting this bankruptcy

case demonstrates a lack of sincerity in dealing with their debts.  Instead, the Court

finds that Debtors have attempted to use the bankruptcy laws to their benefit

without treating creditors equitably.  Indeed, Debtors have engaged in a

manipulation of the Bankruptcy Code.

MEMORANDUM OF DECISION - 14

## 2. Debtors' living arrangements reflect a lack of regard for the interests of their creditors.

In plain terms, under their proposed plan, Debtors' unsecured creditors are asked to foot the bill so that Debtors may continue to live comfortably without significant changes in their spending habits.

Debtors insist that their parents should be allowed to live with them rent-free.  Clearly, Debtors incur additional expenses each month due to this living arrangement, if for no other reason than Debtors continue to occupy a house of a size that greatly exceeds their needs.  But there was no proof offered that any additional expenses to support this living arrangement are appropriate in this case.

The case law makes clear Debtors' parents can not be properly considered their dependents for purposes of a Chapter 13 disposable income analysis.[3]  As one court put it, "[t]o grant such voluntary expenditures priority over existing legal obligations [to creditors] would be to permit [the debtor] unilaterally to subordinate his creditors to his personal lifestyle choices."  *In re Meler*, 295 B.R. 625, 630 (Bankr. D. Ariz. 2003) (quoting *In re Mastromarino*, 197 B.R. 171, 178 (Bankr. D. Me. 1996)) *alterations in original*.  *See also In re Meler*, 295 B.R. 625 (Bankr. D. Ariz.  2003) (finding the debtor's live-in

_____

[3] Where appropriate, this Court has decided that "disposable income analyses in § 707(b) cases can thus be applied to § 1325(a) inquiries."  *In re Bauer*, 309 B.R. 47, 51 n. 7 (Bankr. D. Idaho 2004).

MEMORANDUM OF DECISION - 15

girlfriend and her children do not qualify as dependants and disallowing

expenditures on their  behalf); *United States Trustee v. Duncan* (*In re Duncan*),

201 B.R. 899 (Bankr. W.D. Penn. 1996) (finding where the debtor claimed no

dependants on Schedule I but had multiple family members living in the home

without contributing to the household, that such support by the debtor was

voluntary and could not occur at the expense of creditors).

       While under different facts it would be commendable to care for

aging parents, Debtors' unsecured creditors, to whom they owe a significant

amount, should not have their interests subordinated without any showing that Ms.

Penland's parents actually require Debtors' financial assistance.   Here, as a matter

of personal choice, Debtors and the Derrs do not discuss the parents' financial

resources.  But Debtors' creditors need not assume the Derrs can not afford to live

as comfortably in another convenient setting.  This is especially true in this case

since less than a year ago, the Derrs loaned Debtors $52,000 for home mortgage

payments, repairs and improvements.  This hardly suggests the Derrs need

Debtors' financial support.  Without a showing the Derrs are financially dependent

upon Debtors, this living arrangement is inequitable to Debtors' creditors and

shows a lack of good faith.

MEMORANDUM OF DECISION - 16

### 3. Debtors' monthly expenses are excessive.

Each year, the Court is exposed to several hundred Chapter 13 debtors' budgets. While the "reasonable necessity" of the expenses claimed in those budgets is evaluated based upon the facts of each case, absent compelling circumstances, it is doubtful Chapter 13 debtors should ever be allowed to spend over $5,200 per month in ordinary living expenses. These Debtors are no exception.

As noted above, Debtors have not shown that their living arrangements with the Derrs can justify the high monthly expenses set forth in Debtors' Schedule J. Debtors spend almost $3,000 each month on housing and almost $600 for food to support this arrangement. Mr. Penland testified he was uncertain who pays for the Derrs' food, leaving the Court to speculate whether Debtors' schedules reflect the amount they spend for food for two or four adults. Debtors' need to retain their large home in favor of less expensive housing is therefore questionable. Debtors should not be permitted to "harbor a belief that [they] should be able to continue to reside in accommodations equivalent in extravagance to those presently possessed notwithstanding [their] bankruptcy status." *In re Duncan*, 201 B.R. at 898.

MEMORANDUM OF DECISION - 17

Debtors also claim an expense of $286 a month for life insurance. This Court has previously held that life insurance, unless required by law, is not a necessary expense. *See In re Smith*, 95 I.B.C.R. 194 (Bankr. D. Idaho 1995). No showing was made that the life insurance is required by law. Moreover, there are no minor children in this case to support in the event of a death of one of the Debtors. With $500,000 in presumably vested retirement funds in their accounts, the survivor's security in the event of a death seems assured.

Debtors' failure to adequately trim their monthly expenses demonstrates a lack of good faith and sincerity in attempting deal equitably with their creditors.

### 4. Debtors underestimate their earning capacity.

Debtors are educated, experienced professionals. Both have the ability to earn a very comfortable living. Mr. Penland testified his income is declining because of the policies adopted by his worker's compensation insurance clients. While such may reflect the reality of legal market, Mr. Penland should be expected to react to these changes in his practice to maximize his potential income. As an attorney with 25 years of experience, someone in Mr. Penland's financial circumstances should be motivated to guide his practice in a different, positive direction. He can not expect his creditors to go unpaid while he either

MEMORANDUM OF DECISION - 18

loses money or clients in his practice. Mr. Penland has consistently earned more than $100,000 per year, an income more consistent with his status and experience. Under the circumstances, the Court expects Mr. Penland's income can be expected to rebound such that he could fund higher plan payments. Locking in plan payments based upon his current, below-market level of earnings seems particularly unfair to creditors.

>        **5.    Debtors failed to show they considered accessing their pension funds to address their financial problems.**

Debtors have a significant amount on deposit in their pension funds. These monies are likely exempt. 11 U.S.C. § 522(b)(2); Idaho Code § 11-604A. Even so, in conducting this good faith analysis, the Court is confounded by the lack of evidence that Debtors at least considered whether they could access these funds to deal with their debts. Perhaps the funds are beyond Debtors' reach; but perhaps, as is frequently the case, account loan programs exist allowing Debtors to access these funds or to borrow enough to temporarily deal with their debt issues, repaying such loans with future contributions. Without regard to whether in fact these pension funds could be used to pay creditors, the absence of proof on this point causes the Court to further question Debtors' good faith.

MEMORANDUM OF DECISION - 19

**C.  The Totality of the Circumstances Shows a Lack of Good Faith.**

All appropriate factors considered, the Court finds and concludes that Debtors have not shown their proposed plan is submitted in good faith. Instead, the Court is left with the firm conviction that Debtors, while sincere in their desire to have their debts discharged, are unwilling to engage in the kind of meaningful belt-tightening that could reasonably be expected from those earning as much as they do in order to treat their creditors equitably.

Debtors' most recent and conservative budget proposes to spend $63,519.72 each year for ordinary living expenses.  Over the five-year life of their proposed plan, Debtors propose to pay creditors a total of $59,625[4] in satisfaction of over $220,000 in unsecured debt.  While this is not an inconsequential return to creditors when viewed in isolation, it is inadequate in Debtors' case absent efforts by Debtors to economize.  Debtors plan is not equitable to creditors as is required by § 1325(a)(3).  *See In re Yochum*, 96.2 I.B.C.R. at 78 (citing *In re Goeb*, 675 F.2d at 1390).

### Conclusion

It is extremely rare that the Court would refuse to confirm a Chapter 13 plan in the absence of an objection from either creditors or the Chapter 13

---

[4]  The plan proposes three payments of $300, 57 payments of $1,025, and $300 from the sale of Debtors 1979 Prindle Catamaran for a total of $59,625.

MEMORANDUM OF DECISION - 20

Trustee. But the case law interpreting the confirmation requirements makes it clear that it is the Court's duty to independently weigh the debtor's good faith. In this case, Debtors failed to prove that their Second Amended Chapter 13 Plan was proposed in good faith as required by § 1325(a)(3).

Confirmation of the Plan will be denied. In addition, since Debtors have had an ample opportunity to propose a confirmable plan, and given their lack of diligence in performing their statutory responsibilities, the Court concludes this case should be dismissed. *See* 11 U.S.C. § 1307(c)(1); (5). A separate order will be entered.

Dated: November 8, 2005

Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 21